## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIS RE INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **NO. 16-213** |
| **PETER C. HEARN, *et al.*** | : | |

**KEARNEY, J.**                                                                                    **August 3, 2016**

### MEMORANDUM

A chief executive officer leaving his long-time employer for a competitor now seeks to avoid his agreement to repay a portion of a conditional $1.75 million incentive award because the governing award agreement allows him to retain the award if he retires under a written retirement policy or if his former employer decides he retired. Otherwise, he must return a *pro rata* portion of the incentive award. At the time of his incentive award agreement and today, the employer has no policy defining when or how an employee can retire but does have a pension plan specifically describing the benefits after retirement. This employer's pension plan presumes retirement and does not define when or how an employee can retire. As all parties concede our interpretation of the incentive award contract is a question of law and finding no genuine issues of material fact, we hold the former employer's pension plan is not a written retirement policy under the incentive award agreement. The executive signed the incentive award agreement knowing these terms. As such, the executive agreed he could retain the award upon departure if his employer decided he "retired." As the employer immediately decided the executive did not retire and promptly demanded repayment of the *pro rata* obligation, we grant the employer's motion for summary judgment on its breach of contract claim in the accompanying Order and dismiss the remaining claims.

## I.  Undisputed Material Facts[1]

Peter C. Hearn began working at Willis Re, Inc.'s, eventually becoming its chief executive officer, under a January 24, 1994 employment agreement.[2] The parties signed a January 1, 2011 "First Amendment to Employment Agreement" providing, under the Willis Re Annual Incentive Plan ("AIP"), Hearn "may become eligible" to receive an "annual award payment," also referred to as an "AIP Award," of $1,750,000.[3]

In March 2013, 2014, and 2015, the parties signed letter agreements awarding Hearn a "Willis Retention Award" of $1,750,000 each for 2012, 2013, and 2014[4] subject to:

> If your employment with Willis ends prior to December 31, [2015] [2016] [2017] for any reason other than your incapacity to work due to your permanent disability (as "disability" or a substantially similar term is defined within an applicable Willis long term disability plan/policy), death, your redundancy (as redundancy is determined by Willis in accordance with its usual human resource administration practices) or your ***retirement***, you will be obligated to repay to Willis a pro-rata portion of the net amount ... of the Willis Retention Award (the "Repayment Obligation") – such Repayment Obligation must be promptly satisfied, as more fully explained below . . .. The amount of your Repayment Obligation will be calculated by reducing the amount of the Willis Retention Award by a sum equal to $1/36^{th}$ of your Willis Retention Award for each calendar month of employment you complete with Willis after January 1, 2013.[5]

"Retired" is defined in the AIP Award "by either (i) your employment agreement (i.e., if you are subject to an employment agreement which defines retirement or a substantially similar term) ***or*** (ii) a written retirement policy applicable to you as a Willis employee ***or*** (iii) by reference to the ending of your employment at such mandatory age as may apply in the applicable employment jurisdiction ***or*** (iv) as may be determined by Willis in its absolute discretion."[6]

Hearn signed the AIP Award Letters agreeing to "accept, abide by and be bound by [its] terms and conditions."[7] Willis Re paid Hearn $1,750,000 in March 2013, 2014, and 2015.[8]

On May 5, 2015, Hearn announced his "decision to retire from Willis Re Inc., effective May 15, 2015 to explore other options and pursue other interests."[9] Hearn acknowledged his obligation to "comply with certain terms and conditions applicable to time after [his] retirement from Willis, including an obligation not to compete with Willis" for a period of twelve (12) months beginning May 15, 2015.[10] On May 7, 2015, Willis Re demanded the pro-rata repayment of the AIP Awards.[11] Hearn's last day of employment with Willis Re was June 4, 2015; he was 59-years old and employed by Willis Re for 21 years.[12] On July 8, 2015, Willis Re again demanded the pro-rata repayment of the AIP Awards.[13] Hearn did not repay the pro-rata share, contending he is not obligated to do so.

## II.    Analysis

The parties move for summary judgment on a dispute of contract interpretation of whether Hearn "retired" under the AIP Award Letters.[14] The AIP Award Letters obligate Hearn to repay Willis Re a pro-rata portion of his AIP Award if his employment with Willis Re ends for any reason other than "retirement." The AIP Award Letters define "retirement" "by either" (i) "your employment agreement" *or* (ii) "a written retirement policy applicable to you as a Willis employee" *or* (iii) "by reference to the ending of your employment at such mandatory age as may apply in the applicable employment jurisdiction" *or* (iv) "as may be determined by Willis in its absolute discretion."[15] Hearn argues he "retired" under "a written retirement policy," citing the Willis Re Pension Plan ("Pension Plan"). Willis Re argues the Pension Plan is not a "written retirement policy;" Hearn's eligibility to receive early retirement benefits under the Pension Plan is not the same thing as retiring; and, even if we find the Pension Plan is a "written retirement

policy," Hearn did not retire under it. Willis Re argues Hearn simply resigned to take a job with a competitor and, in exercising its "absolute discretion" under subsection (iv), determined Hearn did not retire.

### A.  We apply Pennsylvania law.

The AIP Award Letters are "governed by the laws applicable to the place in which you are assigned a ***regular office location*** by Willis."[16] The parties dispute whether Hearn's "regular office location" is Pennsylvania or New York.

Willis Re contends Philadelphia was Hearn's regular office location based on a declaration from its Director of US Benefits attesting to Hearn's Philadelphia office location,[17] and the AIP Award Letters addressed to Hearn at his Philadelphia office. Willis Re argues Pennsylvania law on contract interpretation should apply to our analysis of "retirement" under the AIP Award Letters, but cites both Pennsylvania and New York law in opposing summary judgment, conceding both state's substantive laws "are in accord with respect to contract law."[18]

Hearn asserts New York was his "regular office location," submitting a copy of his business card with a New York address.[19] Hearn argues there is factual dispute regarding his regular office location – and consequently whether Pennsylvania or New York law applies.[20] Hearn swears New York is his "regular office location," attaching a January 21, 2011 "term sheet" showing his location in New York City.[21]

According to Hearn, the factual dispute over his "regular office location" precludes the entry of summary judgment ***in Willis Re's favor***, but does ***not*** preclude summary judgment ***in his favor***. Hearn readily admits New York and Pennsylvania law of contract interpretation are the same and, regardless of which state's law applies, his argument the Pension Plan is a "written

retirement policy" remains the same.[22] Hearn argues summary judgment can be entered in his favor as a matter of law.

In opposing summary judgment in favor of Willis Re, Hearn argues New York and Pennsylvania law differ on his affirmative defense to Willis Re's contract claim and the factual dispute over his "regular office location" precludes summary judgment for Willis Re. Hearn asserts New York law, unlike Pennsylvania law, recognizes a public policy against the forfeiture of bonuses considered wages, citing two New York state court cases.[23] He argues Willis Re's attempt to claw back the AIP Awards violates New York public policy.

We disagree there is a difference between New York and Pennsylvania law on this issue. In *Ryan v. Kellogg Partners*, the court held "guaranteed and non-discretionary bonuses" amount to "wages" under New York statute and failure to pay such bonuses violated New York's wage law.[24] In *Weiner v. Diebold*, the court remanded a matter to determine if incentive compensation payments were "earned wages," noting the distinction between a "'bonus' payable at the discretion of the employer, and thus subject to forfeiture, or post-employment commissions such as those earned by a sales representative as to which the employer has no right to withhold or, 'earned wages' also not subject to forfeiture."[25] Similarly, under Pennsylvania's Wage Payment and Collection Law, bonuses are wages protected under the statute if they are "earned," meaning the "right to the wage or bonus vested under the terms of employment."[26]

We find no conflict between New York and Pennsylvania on the payment of earned wages; the laws of both jurisdictions protect an employee's right to earned wages and there is no "true conflict."[27] Even if we applied New York law, there is no issue of material fact precluding summary judgment. On the face of the AIP Award Letters and Employment Agreement, Hearn

5

did not "earn" the AIP Awards because they are discretionary. The Employment Agreement

provides, *inter alia*:

> The 2011, 2012, 2013, 2014 and 2015 AIP Awards will be made in the form of
> a cash payment ***that may, at Employer's discretion, be subject to a vesting
> schedule and/or a repayment obligation under such circumstances as
> Employer may specify,*** unless Employee requests with reasonable notice that
> any one of these AIP Awards be made in the form of restricted stock units of
> Willis Group Holdings Public Limited Company common stock or other
> available instruments . . . any and/or all of which may, at Employer's
> discretion, be a form of deferred compensation and/or subject to vesting
> schedules.[28]

The AIP Award Letters specifically require an employee whose employment with Willis

ends prior to December 31, 2015, 2016 and 2017 for any reason other than retirement to repay a

pro-rata portion of his awards.[29] The AIP Award Letters provide a vesting schedule for a

calculation of the Repayment Obligation.[30] Hearn's awards only partially vested under the

Employment Agreement and AIP Award Letters. As the court explained in *Ryan*, only "vested"

bonuses are considered "earned wages" protected by New York law. We need not determine

whether Hearn's "regular office location" is Philadelphia or New York, as application of either

state's law yields the same result.

## B. Hearn did not "retire" under the AIP Award Letters.

We turn to the dispositive issue of whether Hearn "retired" under the AIP Award Letters.

Both parties assert we can resolve this issue as a straightforward matter of contract interpretation

and we need only look to the four corners of the contracts.[31] Hearn argues he is not obligated to

repay the pro-rata share of the AIP Awards because he "retired" under the Pension Plan which he

argues is "a written retirement policy" in subsection (ii) as the definition of retirement. Willis Re

argues there was no "written retirement policy" applicable to Hearn, the Pension Plan is not a

"written retirement policy," and assuming the Pension Plan is a "written retirement policy,"

Hearn did not retire under it. Willis Re contends it exercised its absolute discretion under subsection (iv) and determined Hearn did not retire and must repay the pro-rata share of his AIP Awards.

To interpret the AIP Award Letter contract terms, we must look at the contract as a whole and consider the "combined effect" of the clauses.[32] We must never interpret terms "in a manner which nullifies other terms in the same agreement."[33] When a contract contains both specific and general provisions, the "specific controls the general."[34]

We must give each clause effect and we must not interpret any clause so as to nullify another. Under subsections (i-iii), retirement may be defined (i) by an employment agreement, (ii) by a written retirement policy, or (iii) by applicable law. Subsection (iv) gives Willis Re the discretion to define retirement. Subsections (i-iii) provide specific means of defining retirement and (iv) is more general. When (i-iii) apply, these subsections prevail over subsection (iv). Because we may not interpret (iv) in a manner nullifying (i-iii), we must interpret (iv) as a catch-all provision, only applicable where (i-iii) are not. To determine whether Hearn "retired" under the AIP Agreements, we must determine whether (i-iii) apply.  If none of these subsections apply, we will apply (iv) and allow Willis Re to define Hearn's retirement in its absolute discretion as Hearn agreed in signing the AIP Award Letters.

### 1. The Pension Plan is not a "written retirement policy."

The Pension Plan is a defined benefit pension plan sponsored by Willis North America, Inc. and is a "pension plan" as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.*  The terms "employee pension benefit plan" and "pension plan" mean:

> ***any plan, fund, or program*** which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that

7

by its express terms or as a result of surrounding circumstances such plan, fund, or program--

(i)     provides retirement income to employees, or

(ii)    results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, . . .[35]

The Pension Plan provides for retirement benefits including an "Early Retirement Benefit."[36] A "Participant"[37] who "retires on his Early Retirement Date" is entitled to a "Retirement Benefit" as calculated by a formula provided in the Retirement Plan.[38] The term "Early Retirement Date" is defined as "the first day of any month coinciding with or following the date the Participant attains age fifty-five (55), but not age sixty-five (65) and has completed at least ten (10) years of Vesting Service."[39] Neither party disputes Hearn's eligibility for an "Early Retirement Benefit" under the Pension Plan.

The Pension Plan specifically identifies the benefits for retired persons. This Pension Plan, possibly unlike others, does not define retirement. It presumes retirement.

### 2.  Contract construction of the AIP Award Letters.

The AIP Award Letters require the departing Hearn repay the *pro rata* Award for any reason other than: "incapacity to work due to your permanent disability," death, "your redundancy" or "your retirement." The term "disability" in the phrase "incapacity to work due to your permanent disability" specifically refers to the definition "within an applicable Willis long term disability plan/policy."[40] The term "redundancy" is "determined by Willis in accordance with its usual human resource administration practices."[41] The term "retirement" is defined in four alternative subsections; at issue here is subsection (ii) "written retirement policy." This term does not refer to any Willis Re "plan/policy" or "usual human resource administration practices."[42]

8

Hearn asks us to interpret "written retirement policy" to mean the Pension Plan, and because he is eligible for an "Early Retirement Benefit" from the Pension Plan, he "retired" under a "written retirement policy." Well-settled principles of contract interpretation prevent us from adopting his reading. "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties."[43] "The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself."[44] In determining intent, "the whole instrument must be taken together," and we do not assume a contract's language "was chosen carelessly" or "that the parties were ignorant of the meaning of the language employed."[45] Where the language of a contract is complete, clear, and unambiguous, we must enforce the contract according to the plain meaning of its terms.[46] We may not "construe a contract in such a way as to modify the plain meaning of its words, under the guise of interpretation."[47]

The words used in subsection (ii) are "written retirement policy," not "Pension Plan." If these sophisticated parties negotiated incentive payments for a chief executive officer intended the term "written retirement policy" to be defined as eligibility for benefits under the Pension Plan, they were free to include it. The parties could have done so in the same way the parties expressly defined "disability" in the phrase "incapacity to work due to your permanent disability" as the definition "within an applicable Willis long term disability plan/policy" and "redundancy" as "determined by Willis in accordance with its usual human resource administration practices."[48] The parties could have referred to the Pension Plan in subsection (ii), but did not do so.

Hearn argues subsection (ii) entitled him to retire under a "written retirement policy applicable to [him] as a Willis employee" and "that 'written retirement policy' is embodied in

9

the Plan."[49] Hearn argues the Pension Plan *is* the "written retirement policy" despite the AIP Award Letters not referring to the Pension Plan. Under the principles of contract construction, we do not assume the terms used in the AIP Award Letters were chosen carelessly and decline to find the parties intended the phrase "written retirement policy" to mean the Pension Plan.

We similarly reject Hearn's reference to Willis Re's "long term disability plan/policy" as evidence of interchangeable, "one-in-the-same" terms. The term "plan/policy" with reference to Willis Re's long term disability ("LTD") plan pertains to an "employee welfare benefit plan" defined by ERISA as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, ***through the purchase of insurance or otherwise,*** (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment....[50]

An "employee welfare benefit plan" may be funded or insured by a policy of insurance and is governed by ERISA if the policy is obtained through: "(1) a plan, fund, or program; (2) that is established or maintained; (3) by an employer; (4) for the purpose of providing benefits; (5) to its participants or beneficiaries."[51] In the context of "employee welfare benefit plans" – as opposed to an "employee pension benefit plan" and "pension plan" as defined by ERISA – a ***policy of insurance*** funds the ***benefits*** provided by the plan established or maintained by the employer. This is typical in the context of employee welfare benefit plans providing medical benefits, life insurance benefits, and LTD benefits by employers to their employees. Willis Re's Benefits Guide shows its "plans" with insurance carriers such as Aetna for "Medical Plans & Prescription Drug Program," MetLife for "Dental" and "Life and Supplemental Life," and Prudential for "Short-Term and Long-Term Disability."[52] The terms are not "one-in-the-same"

and the policy referred to in the context of Willis Re's "long term disability plan/policy" refer to the ***insurance policy***.

Further, including "plan/policy" as to disability confirms the parties understood those terms could have different meanings. They took the care to ensure those terms had the same meaning as to long term disability but elected not to do so in defining a written retirement policy.

As our Court of Appeals instructs in *Angst v. Mack Trucks*, a one-time lump-sum payment which does not create a new administrative scheme or impose new administrative requirements but requires continuation of an existing procedure is not an ERISA pension plan.[53] The AIP Award Letters are part of present employee compensation. They do not create a new administrative scheme or impose new requirements. The compensation is paid to a present employee and does not involve administering post-employment benefits.

We find Hearn's citation to *Gilbert v. Burlington N. Industries, Inc.* for the proposition courts treat "policies" as tantamount to "plans" for purposes of ERISA distinguishable.[54] In *Gilbert*, the Court of Appeals analyzed whether an employer's severance pay policy is an ERISA plan preempting state law, and held an unfunded severance pay policy constitutes an "employee welfare benefit plan" under ERISA.[55] *Gilbert* is limited to its facts and, at any rate, did not turn on the nomenclature of "policy" and "plan." Instead, the court analyzed whether the severance policy came within ERISA's definition of "welfare plan." Conversely, our Court of Appeals in *Angst.* held ERISA did not govern a "buyout plan."[56] Our Court of Appeals held the "buyout plan" – which would have provided an initial lump-sum payment followed by one year of benefits to employees who voluntarily left Mack Trucks' employ – did not implicate ERISA.[57] Importantly, the court examined Mack Trucks' "buyout ***plan***" and found it was not a "plan"

11

within the meaning of ERISA. Its decision did not turn on the language used. Similarly, in *In re Joy Global, Inc.*, the district court found a company's severance ***policy*** is not an ERISA ***plan***.[58]

We also find Hearn's citation to *Paluda v. ThyssenKrupp Budd Company* distinguishable.[59] Hearn argues we should interpret "written retirement policy" as the Pension Plan, relying on *Paluda* where the court used the terms "plan" and "policy" interchangeably. The question in *Paluda* and addressed by other courts is whether a one-time severance benefit plan is governed by ERISA depending on whether the employer, after committing to pay benefits, "undertakes 'a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements.'"[60] The "plant closing agreement" in *Paluda* required the employer to ensure benefits to various employees at different levels based on a variety of criteria, with ongoing health coverage, disability and welfare benefits in addition to the severance payment. The district court found paying these benefits "had a major effect on the overall welfare" of the employer.[61] The AIP Award Letters relate to Hearn. There is no evidence Willis Re provided this benefit to employees at various levels or any complicating factor. We have no basis to find its recovering a *pro rata* portion of the incentive award will have a major effect on the overall welfare of Willis Re as in *Paluda*.

Hearn cites Willis Re's 2012 Proxy Statement referring to its "US retirement program, the Willis North American Inc. Pension Plan, a qualified defined benefits plan" as evidence to rebut Willis Re's assertion it has no "written retirement policy" applicable to North American employees such as Hearn.[62] Hearn admits the Proxy Statement uses the term "retirement program" while the AIP Award Letters use the term "retirement policy."[63] Although ERISA

defines "employee pension benefit plan" to mean "any plan, fund, or program" established or maintained by an employer to provide retirement income to its employees, and ***does not*** include the word "policy" in the phrase "any plan, fund, or program," Hearn nevertheless argues there is no meaningful difference between "policy" and "program." He then acrobatically leaps to the dictionary definition of "policy," which includes "program" as a synonym. Hearn's argument rebutting Willis Re's evidence it has no written retirement policies applying to North American employees like Hearn is unpersuasive.[64] Instead, he rests on his *ipse dixit* assertion the Pension Plan is the "written retirement policy." As shown, we disagree. The Pension Plan addresses obligations after retirement. Hearn agreed, absent a written retirement policy, Willis Re could determine in its sole discretion whether he is considered "retired." Within days of learning of his decision to leave its employ, Willis Re notified Hearn of his obligation to repay and then repeated its demand for repayment within days of his departure.

We reject Hearn's argument subsection (iv) violates the covenant of "good faith and fair dealing" implicit in every contract. Generally, the covenant of good faith and fair dealing is "an interpretive tool to determine 'the parties' justifiable expectations" and "do[es] not enforce an independent duty divorced from the specific clauses of the contract."[65] Willis Re and Hearn agreed to a specific clause giving Willis Re sole discretion to define retirement in determining whether he would be required to repay a portion of his $1.75 million annual AIP Award. Hearn's Employment Agreement did not provide a definition for retirement, he did not agree to a separate retirement policy, and his employment jurisdiction did not mandate a retirement age. Under these circumstances, the parties could justifiably expect Willis Re would have the discretion to define retirement. If Hearn did not want Willis Re to have this discretion, he could have insisted this

13

clause be taken out of the contract. We do not find subsection (iv) to violate the covenant of good faith and fair dealing.

Hearn also argues subsection (iv) should not apply because contracts giving unfettered decision-makers are illusory and invalid and one provision cannot swallow up another provision. Neither argument is convincing. Contracts giving one party sole discretion to interpret its terms are enforceable as long as the party exercises its discretion consistently with the implied covenant of good faith and fair dealing.[66] As discussed above, Willis Re did not violate the covenant of good faith and fair dealing by invoking subsection (iv). Willis Re does not ask us to interpret (iv) so as to "swallow up" any other provision of the AIP Award Letters. Hearn's argument only makes sense if we accept his equating "written retirement policy" with the Pension Plan. Finding no basis to do so, we interpret subsection (iv) as a catch-all provision allowing Willis Re to define retirement if no definition appears in (i) an employment agreement (ii) a written retirement policy, or (iii) applicable law. If Hearn's Employment Agreement defined retirement (which the parties could have done), but Willis Re invoked (iv) to define retirement, this would likely be an unacceptable use of subsection (iv). This is not the scenario we face today. As subsections (i)-(iii) do not apply to Hearn, Willis Re may fairly invoke (iv). Because subsection (iv) is the only applicable provision, Willis Re retained discretion to determine if Hearn "retired." Willis Re, in exercising its contractually-authorized discretion, determined Hearn did not retire. Willis Re immediately and repeatedly notified Hearn of its determination when it requested Hearn repay a pro-rata portion of his AIP Award. By refusing to repay these awards, Hearn has breached the AIP Award Letters. We grant summary judgment for Willis Re on its breach of contract claim.

14

### C. Willis Re's Unjust Enrichment and Conversion Claims

Having found "written retirement policy" does not mean the Pension Plan, and awarding summary judgment in favor of Willis Re on its breach of contract claim, we need not address its alternative claims of unjust enrichment and conversion.

### III.    CONCLUSION

The dispute centers on Hearn's obligation to repay annual incentive plan awards under the terms of the parties' agreement. Both parties assert this is a purely legal question of contract construction. We agree. The resolution of this dispute turns on whether Hearn "retired" from Willis Re as defined by the parties' agreements. If Hearn "retired" from Willis Re, he has no obligation to repay incentive awards; if Hearn did not "retire" from Willis Re, he is obligated to repay a portion of incentive awards. We find Hearn did not "retire" under the terms of the parties' agreements. In the accompanying Order, we enter summary judgment in favor of Willis Re on its breach of contract claim.

---

[1] The Court's Policies require a motion filed under Fed.R.Civ.P. 56 include a Statement of Undisputed Material Facts ("SUMF") as well as an appendix of exhibits or affidavits. Hearn filed his SUMF at ECF Doc. No. 29-1 ("Hearn SUMF"). Hearn's Appendix is filed at ECF Doc. No. 29-4 through 29-22. Willis Re responded to Hearn's SUMF and, within that response, included additional facts in support of its opposition to Hearn's motion for summary judgment at ECF Doc. No. 37 ("Willis Re SUMF"). Willis Re supplemented Hearn's Appendix at ECF Doc. No. 36-3 to 36-6. Hearn filed a response to Willis Re's SUMF at ECF Doc. No. 48-1. References to exhibits in the appendices shall be referred to by Bates number, for example, "1a."

[2] Hearn SUMF at ¶ 3.

[3] *Id.* at ¶¶ 4- 5; First Amendment to Employment Agreement ("Employment Agreement") ¶ 2(C) at 17a-18a.

[4] *Id.* at ¶ 8; 38a - 40a. The Employment Agreement refers to the annual award payment as an "AIP Award," while the March 2013, 2014, and 2015 letter agreements refer to the award as a "Willis Retention Award." *Compare* 17a with 38a-40a. The March 2014 and 2015 letter agreements clarified the "Willis Retention Award payment" as "i.e. the 2013 AIP Award" and "i.e. the 2014 AIP Award," respectively. *See* 39a, 40a. Hearn's SUMF refers to the letter agreements as "AIP Production Award Letters," a term to which Willis Re objects. *See* Willis Re SUMF at ¶ 8 (ECF Doc. No. 37). Willis Re refers to the letter agreements as "AIP Award Agreements." *Id.* Whatever the term used, the parties agree the March 2013, 2014, and 2015 letters pertain to the annual "AIP Award." We refer to the March 2013, 2014, and 2015 letters as the "AIP Award Letters."

[5] 38a - 40a (emphasis added) (footnotes omitted). The term "Repayment Obligation" is footnoted in the AIP Award Letters:

> If you were a Willis associate based in the United States or Canada prior to such employment cessation, then, to the fullest extent permitted by applicable law, you will be obligated to repay a pro-rata portion of the gross amount of the Willis Retention Award if, and to the extent that, you satisfy your Repayment Obligation in a calendar year other than the calendar year in which you received such Willis Retention Award.

[6] *Id.* at n. 2 (emphasis added).

[7] 38a - 40a.

[8] Complaint at ¶¶ 10-12 (ECF Doc. No. 1); Answer at ¶¶ 10-12 (ECF Doc. No. 24).

[9] 4a. Hearn's SUMF at ¶¶ 34-35 asserts the letter is dated May 5, <u>2014</u>. We assume this is a typographical error as the letter is dated May 5, <u>2015</u>.

[10] *Id.*

[11] Willis Re SUMF at ¶ 10; 1659a-1662a.

[12] Hearn SUMF at ¶¶ 36, 39.

[13] Compl., at ¶ 23; Hearn's Answer, at ¶ 23. Willis Re alleges Hearn's pro-rata repayment obligations for the AIP Award are: $340,277.78 for 2013; $923,611.11 for 2014; and $1,506,944.44 for 2015, for a total of $2,770,833.33. Compl. at ¶¶ 19-22; *see also* Affidavit of Richard Heading at ¶¶ 13-14 at 1651a-1652a; 1659a-1662a.

[14] Willis Re sued Hearn for breach of contract, and, in the alternative, unjust enrichment and conversion. Hearn moved for summary judgment Willis Re requested we issue an order to show cause why judgment should not be entered in its favor under Fed.R.Civ.P. 56(f)(1). We ordered Hearn to show cause why we should not grant summary judgment in favor of Willis Re on its breach of contract claim. We apply the well-settled summary judgment standard. Summary

judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[15] 38a-40a (emphasis added).

[16] *Id.* (emphasis added).

[17] *See* Declaration of Lynn Bissinger at ¶¶ 11-13; 1669a-1670a, 1672a-1680a.

[18] *See* Willis Re's opposition at 9-10, n.3 (ECF Doc. No. 36).

[19] *See* Hearn's brief at 13, n.46 (ECF Doc. No. 29-2) and business card at 1625a.

[20] *See* Hearn brief at 11-13 (ECF Doc. No. 48).

[21] *See* Hearn Declaration and Term Sheet attached as Exhibits D and E, respectively, to Hearn's Rule 56(f) brief (ECF Doc. Nos. 48-5 and 48-6).

[22] *See* Hearn's brief at 12 (ECF Doc. No. 48).

[23] *Ryan v. Kellogg Partners Inst. Servs.*, 968 N.E.2d 947 (N.Y. 2012); *Weiner v. Diebold Grp., Inc.*, 568 N.Y.S.2d 959 (N.Y. App. Div. 1991).

[24] *Ryan*, 19 N.Y.3d at 16, 968 N.E.2d at 956.

[25] *Weiner*, 173 A.D.2d at 167, 568 N.Y.S.2d at 961.

[26] *Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 470 (E.D. Pa. 2013) (citations omitted); "Wages" includes "all earnings of an employee . . .." 43 P.S. §260.21.

[27] A federal court sitting in diversity applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). If the laws of each jurisdiction are the same, or if application would lead to the same result, "there is no *conflict* at all, and conflict

of law analysis is unnecessary." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). "If there are relevant differences between the laws, then the court should examine the governmental policies underlying each law and classify the conflict as a 'true,' false,' or an 'unprovided-for' situation. A 'deeper [choice of law] analysis' is necessary only if both jurisdictions' interests would be impaired by the application of the other's laws (i.e., there is a true conflict)." *Id.*

[28] Employment Agreement ¶ 2(C) at 17a (emphasis added).

[29] 38a-40a.

[30] *Id.*

[31] *See* Willis Re opposition at 11 (ECF Doc. No. 36); Hearn's brief in response to the order to show cause at 1 (ECF Doc. No. 48).

[32] *Southwestern Energy Production Co. v. Forest Resources, LLC,* 83 A. 3d 177, 187 (Pa. Super. 2013).

[33] *Id.*

[34] *Id.*

[35] 29 U.S.C. § 1002(2)(A) (emphasis added).

[36] Pension Plan at §3.02 (76a).

[37] "Participant" is defined by the Pension Plan as "any Employee who becomes eligible to participate in the Plan pursuant to Article II and who continued to be entitled to any benefits under the Plan." *Id.* §1.24 (66a).

[38] *Id.* at §3.02(b) (77a).

[39] *Id.* at §1.16 (64a).

[40] 38a-40a.

[41] *Id.*

[42] *Id.*

[43] *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citing *Felte v. White*, 302 A.2d 347, 351 (Pa. 1973)).

[44] *Id.* (citing *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)); *see also Atkinson v. Lafayette Coll.,* 460 F.3d 447, 452 (3d Cir. 2006) (quoting *Martin v. Monumental Life Ins. Co.,* 240 F.3d 223, 232–33 (3d Cir. 2001)).

[45] *Murphy,* 777 A.2d at 429 (citing *Felte*, 302 A.2d at 351 and *Steuart*, 444 A.2d at 662).

[46] *Id.*

[47] *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1010 (3d Cir. 1980) (quoting *Best v. Realty Management Corp.*, 101 A.2d 438, 440 (Pa. Super. 1953)).

[48] Similarly, under the "Term of Agreement" section of the Employment Agreement, the parties defined the term "disability" by the definition in Willis Re's Long Term Disability Benefits Plan. *See* Employment Agreement at ¶ 6 (18a-19a).

[49] ECF Doc. No. 29-2 at 9.

[50] 29 U.S.C. §1002(1) (emphasis added).

[51] *Spillane v. AXA Financial, Inc.*, 648 F.Supp.2d 690, 695 (E.D.Pa. 2009).

[52] 311a.

[53] 969 F.2d 1530, 1540-41 (3d Cir. 1992).

[54] 765 F.2d 320 (2d Cir. 1985).

[55] *Id.* at 325.

[56] *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1538 (3d Cir. 1992).

[57] *Id.* (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987)).

[58] *In re Joy Global, Inc.*, 346 B.R. 659 (D. Del. 2006).

[59] *Paluda v. Thyssenkrupp Budd Co.*, No. 07-10849, 2007 WL 1869344 (E.D. Mich. June 28, 2007).

[60] *Id.* at *2 (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987)).

[61] *Id.* at *3.

[62] ECF Doc. No. 48 at 6.

[63] *Id.*

[64] *See* Bissinger Declaration at ¶ 6 (1667a-1670a); Fahy Declaration at ¶ 3(1682a-1684a).

[65] *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 (3d Cir. 1995).

[66] *Goldstein v. Johnson & Johnson.*, 251 F.3d 433, 436 (3d Cir. 2001) ("in accordance with ordinary contract principles, we conclude that, depending on the language used, such a clause has the potential to grant the plan administrator discretion to construe the terms of the plan, subject to the implied duty of good faith and fair dealing.")